UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **COMSPEC INTERNATIONAL, INC.**, | 2:20-cv-10067-TGB-EAS |
| Plaintiff, | HON. TERRENCE G. BERG |
| v. | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (ECF NO. 44)** |
| **UNIFACE B.V., ET AL.**, | |
| Defendants. | |

This is a business dispute between ComSpec (Plaintiff), a Michigan developer and provider of software information systems, and Uniface (Defendant), a foreign limited liability software corporation organized under the laws of the Netherlands. After Plaintiff filed a Second Amended Complaint (ECF No. 28), Plaintiff filed a motion for partial summary judgment on the breach of contract claim. Additionally, Defendants filed a motion to dismiss for lack of personal jurisdiction pursuant to 12(b)(2) (ECF No. 43) and a motion to dismiss for failure to state a claim pursuant to 12(b)(6) (ECF No. 44). On May 10, 2021, this Court held a hearing on all three of the pending motions. From the bench, the Court granted Defendants' motion to dismiss for lack of personal jurisdiction as to certain defendants and denied Plaintiff's motion for

1

partial summary judgment. Still pending is Defendants' motion to dismiss for failure to state a claim, which shall be **GRANTED**.

## I.     BACKGROUND

Defendant Uniface offers a universal programming language, which allows software developers to "develop and deploy their own software applications to end user customers." ECF No. 28, PageID.770. The Uniface Software is protected by multiple copyrights. Plaintiff ComSpec develops software information systems. One of the components of ComSpec's system, Empower, utilizes Uniface Software to develop user interfaces. ECF No. 28, PageID.773.

On June 10, 1994, Plaintiff ComSpec entered into a license agreement with Defendant Uniface, in which ComSpec agreed to pay a total license fee of $1,000 per year. ECF No. 28, PageID.774. Later that year, Defendant Uniface was purchased by Compuware as a stand-alone company. Five years later, on June 11, 1999, Compuware and Plaintiff ComSpec entered into a value added reseller license agreement, which granted Plaintiff a non-exclusive license to use the Uniface Software to develop and deploy ComSpec's Uniface Application for its end user customers. Under this agreement, ComSpec would pay an initial "deployment royalty equal to 10% of the current selling price of ComSpec's Uniface application for each of its end user customers ("Royalty") and for each year of the term thereafter, an end user support fee of 1.5% of the selling price ("Annual Maintenance")." ECF No. 28,

PageID.774. On March 23, 2004, the agreement was amended by Compuware, to change the Royalty to 7.5% and the Annual Maintenance fee to 1%.

On January 31, 2014, Defendant Marlin Equity purchased assets from Compuware, including Compuware's Uniface business unit and the agreement with ComSpec. ECF No. 28, PageID.775. As a result of this transaction, Defendant Marlin Equity owns, operates, and controls Defendant Uniface and is the owner and assignee of the agreement which is the center of this dispute. Plaintiff ComSpec alleges that after the sale, Compuware confirmed that ComSpec was paid up and did not owe anyone for any past royalties. ECF No. 28, PageID.777. On September 30, 2014, the agreement was once again amended, which changed the Royalty to 10% and the Annual Maintenance to 1%. ECF No. 28, PageID.778. The agreement was amended two more times, in 2016 and 2019.

According to ComSpec, the process for paying royalties during the entire life of the reseller agreement was as follows:

> The customary business practice between Uniface and ComSpec since 2014 has been that for every new customer, ComSpec would inform Uniface of the new customer. Uniface would then send an invoice to ComSpec for 10% of the selling price of ComSpec's Uniface Application as the Royalty a deployment royalty for that new customer and for each year thereafter, annual maintenance of 1% of the selling price. ComSpec would pay Uniface the invoiced amount after receiving the invoice. No accounting was required for continuing customers after the first year because Uniface had the necessary information to issue an invoice, i.e., customer name and

3

the selling price. If a customer was no longer using the Empower software, then ComSpec would inform Uniface after receiving the associated invoice, at which point Uniface would adjust the next invoice.

ECF No. 41, PageID.1027.

In 2019, Plaintiff ComSpec informed Defendant Uniface that it had entered into a letter of intent for the sale of ComSpec for $2,500,000. ECF No. 41, PageID.1028. Plaintiff ComSpec alleges that Defendant Uniface refused to consent to assigning the license agreement to the first potential buyer. Shortly after, Defendant Schouten requested an audit of Plaintiff ComSpec's books pursuant to the licensing agreement. After providing its financial information for the years 2017 to 2019, the results of the internal investigation alleged that Plaintiff ComSpec owed $5,966,579. According to Plaintiff, this was the first time they were informed of alleged past due payments and none of the alleged past royalty fees had been invoiced to them.

Defendants dispute these allegations. Rather, they assert that after asking to inspect ComSpec's records, they received a letter on July 31, 2019, "admitting that [ComSpec] had failed to pay Uniface tens of thousands of dollars in royalties under the Agreement," and asking Uniface to accept ComSpec's calculated underpayment of $60,424. ECF No. 45, PageID.1474.

According to Plaintiff, Defendants contend the calculation of the alleged arrearage was based on "sales per customer," but that language

4

does not appear in the agreement. Additionally, the calculation amount included estimates for the years 1994 to 2015, a period for which Plaintiff ComSpec did not provide financial information. Rather, Defendants "just repeated the same information as 2016." ECF No. 41, PageID.1030. Defendants, however, assert that an inspection of Plaintiff's records found that ComSpec was using a "Software-As-A-Service" or "SAAS" model, "a model under which ComSpec should have been paying Uniface significantly higher royalties." ECF No. 45, PageID.1475.

Due to the demand for payment and refusal to consent to assignment, the first potential buyer's letter of intent to purchase ComSpec expired. However, on November 9, 2019, Plaintiff ComSpec entered into a letter of intent with a second buyer for $2,550,000. Defendant Uniface sent a demand letter requesting the $5,966,579 be paid immediately otherwise it would sue for breach of contract and copyright infringement. Plaintiff informed Defendant Uniface that the demand was miscalculated, and Defendant responded by stating that it was terminating the agreement and provided a draft complaint of its claims of breach of contract and copyright infringement. Subsequently, the letter of intent with the second potential buyer expired without a completed sale.

In its Complaint, Plaintiff alleges that Defendants' $5.9 million demand was incorrect and that as a consequence of the wrongful termination of the agreement, ComSpec's owner and founder lost two

opportunities to sell the business. Plaintiff alleges causes of action for (1) breach of contract, (2) illegal monopoly under the Sherman Act, (3) violation of RICO, (4) tortious interference with business expectancy, and (5) tortious interference with contract. ECF No. 28.

Plaintiff filed a motion for partial summary judgment (ECF No. 41), and Defendants filed a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) (ECF No. 43), as well as a motion to dismiss for failure to state a claim pursuant to 12(b)(6) (ECF No. 44). On May 10, 2021, this Court heard oral argument on all three of the motions. At the close of the hearing, the Court ruled from the bench as to two of the motions, dismissing Defendants Marlin Equity Partners, M4, Schouten, and Oirbans for lack of personal jurisdiction and denying Plaintiff's motion for partial summary judgment. ECF No. 63, PageID.2179-81. The Court took Defendant's motion to dismiss under 12(b)(6) under the advisement, stating that it would resolve that motion in a written opinion.

The Court now turns to Defendants' motion to dismiss pursuant to 12(b)(6). Defendants' raise four issues in their motion to dismiss, which aims to dismiss counts two, three, four, and five in their entirety, and count one against non-Uniface Defendants.

## II.    STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes courts to dismiss a lawsuit if they determine that the plaintiff has

"fail[ed] to state a claim upon which relief can be granted." In evaluating a motion to dismiss under Rule 12(b)(6), courts must construe the complaint in the light most favorable to the plaintiff and accept all well-pled factual allegations as true. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006)).

Although Rule 8(a) requires only that pleadings contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), plaintiffs must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" in support of their claims. *Albrecht v. Treon*, 617 F.3d 890, 893 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)).

## III.   ANALYSIS

### a.   Breach of Contract Against Non-Uniface Defendants

Marlin Equity Partners, M4, Mr. Schouten, and Ms. Oirbans have already been dismissed from this action for lack of jurisdiction; therefore, the only remaining Defendants are Uniface, B.V. and Uniface USA. Defendants seek dismissal of as to the breach of contract claim against Uniface USA.  Defendants assert that the only two parties to the contracts at issue are Plaintiff and Uniface B.V.—"Plaintiff cannot plausibly allege that a contract exists between Plaintiff and any other entity or individual." ECF No. 44, PageID.1435. Additionally, Defendants

7

contend that Plaintiff provides no factual support to extend liability to Uniface USA under an alter ego theory because Plaintiff is unable to pierce the corporate veil. ECF No. 44, PageID.1437.

"Under Michigan law, a breach-of-contract claim requires that the plaintiff establish that he or she was a party to the contract at issue." *Creelgroup, Inc. v. NGS Am., Inc.*, 518 F. App'x 343, 346 (6th Cir. 2013). Here, the language of the contracts at issue only refer to two parties: Plaintiff and Uniface B.V. *See Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) (quoting *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir.1998) ("[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."). While Plaintiff appears to assert that a contract may be implied by Uniface USA's conduct—such as an employee's contacts and email signature—an implied contract may only arise if there is no express contract. *Creelgroup*, Inc., 518 F. App'x at 347. There were  express contracts here which did not include Uniface USA.

But Plaintiff argues that Uniface USA should be treated collectively with Uniface B.V. under an alter ego theory of liability. ECF No. 47, PageID.1562. While there is a presumption in favor of respecting the corporate form, a court may "pierce the corporate veil" and hold a third party liable for the corporation's actions if (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate

entity was used to commit fraud or wrong, and (3) there was an unjust loss or injury to the plaintiff. *Bodenhamer Bldg. Corp. v. Architectural Research Corp.*, 873 F.2d 109, 112 (6th Cir.1989); *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 798 (6th Cir. 2007). Courts may consider several factors to determine whether to pierce the corporate veil, including "the maintenance of separate books, the degree of separation of the corporation's and shareholders' finances, any disregard of corporate formalities, the existence of the corporation as a sham." *Xerox Corp. v. N.W. Coughlin & Co.*, 2009 WL 261530 at *5 (E.D.Mich.2009). As explained by the Michigan Court of Appeals:

> A corporation—or other artificial entity—is a legal fiction. It is an artificial being, invisible, intangible, and existing only in contemplation of law. Absent some abuse of corporate form, courts honor this fiction by indulging a presumption—often referred to as the corporate veil—that the entity is separate and distinct from its owner or owners. Courts will honor this presumption even when a single individual owns and operates the entity. However, the fiction of a distinct corporate entity separate from the stockholders is a convenience introduced in the law to subserve the ends of justice. When this fiction is invoked to subvert justice, it is ignored by the courts. As such, a court sitting in equity may look through the veil of corporate structure—that is, pierce the corporate veil—to avoid fraud or injustice.

*Lim v. Miller Parking Co.*, 560 B.R. 688, 705–06 (E.D. Mich. 2016) (referencing *Green*, 310 Mich. App. at 450–51, 873 N.W.2d at 803–04 (citations, quotation marks, and alterations omitted*)); see also Paul v. Univ. Motor Sales Co.*, 283 Mich. 587, 602, 278 N.W. 714, 720 (1938) ("[W]hen the notion of legal entity is used to defeat public convenience,

justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.").

Here, Plaintiff has failed to even allege the three elements utilized to establish an alter ego claim with regards to Uniface USA. Plaintiff claims that an employee of Uniface USA was handling managerial tasks associated with the contracts, communicating with Plaintiff about payment under the contracts, and utilizing an email address and signature that make it appear that she is a part of Uniface B.V.—but, none of these facts provide any allegations of a sham or improper use of the corporate form. ECF No. 47, PageID.1561-62. Indeed, a fact-intensive inquiry here reveals the opposite: Uniface USA has distinct corporate policies, different offices, and keeps "separate payroll, meeting minutes, books, tax returns, and financial statements." ECF No. 45, PageID.1488. *Cf. Grand Rapids Associates Ltd. Partnership v. Coop Properties, LLC*, 495 F. App'x 598, 601 (6th Cir. 2012) (Holding that corporate entity was a mere instrumentality of another entity where corporation had no distinct profits, did not pay its own utility bills and expenses, or have independent decision-making power.). But, even if Plaintiff presented a basis for the Court to conclude that Uniface B.V. is a "mere instrumentality" of Uniface USA, there are no allegations regarding how Uniface B.V. was used by Uniface USA "to commit a fraud or wrong," or how Plaintiff suffered particular loss because of this intermingling. *Cf. EPLET, LLC v. DTE Pontiac North LLC*, 984 F.3d 493, 500 (6th Cir.

10

2021) (Finding that a Michigan law allowed Plaintiff to pierce Defendant's corporate veil because Plaintiff directed its wholly owned subsidiary to stop services which breached contractual obligations."). *See Rogel v. Dubrinsky*, 337 F. App'x 465, 470-71 (6th Cir. 2009).

Because Defendant Uniface USA was not a party to the contracts at issue and Plaintiff has failed to plead any of the requisite elements required to pierce the corporate veil, Plaintiff's breach of contract claim against Uniface USA fails to state a claim and will therefore be dismissed.

### b.   **Illegal Monopoly Under Sherman Act (Count Two)**

Next, Defendants contend that this Court should dismiss Count Two in its entirety because Plaintiff has failed to adequately plead an antitrust claim. Specifically, Defendants assert that Plaintiff has failed to credibly define the relevant market, allege how Defendants developed monopoly power by anti-competitive or exclusionary means, or assert how Defendants' actions diminished competition.

In the antitrust context, the Supreme Court is clear that "a district court must retain the power to insist on some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n. 17 (1983)). *See also Foundation for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 530 (6th Cir. 2001) ("While

the pleading standard under the federal rules is very liberal ... 'the price of entry [into the federal courts on a private antitrust claim], even to discovery, is for the plaintiff to allege a factual predicate concrete enough to warrant further proceedings, which may be costly and burdensome.'").

Under Section 2 of the Sherman Act, it is illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. "In addition to defining the relevant product market and demonstrating the defendant's power in that market, the plaintiff in an antitrust case must also define the relevant geographic market and demonstrate that the defendant's actions produced anticompetitive effects in that defined area." *Michigan Division-Monument Builders of North America v. Michigan Cemetery Ass'n*, 524 F.3d 726, 733 (6th Cir. 2008) (referencing *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir.2001)).

There are several deficiencies in Plaintiff's antitrust pleadings, but the Court will discuss two, both of which are independently dispositive of the claim. First, Plaintiff defines the "relevant market" as "Uniface Based Software Market." ECF No. 47, PageID.1570. But, the relevant market in an antitrust action "is composed of products that have reasonable interchangeability for the purposes for which they are produced...." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S.

12

377, 404 (1956). *See also American Council of Certified Podiatric Physicians & Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 622 (6th Cir.1999) ("The relevant market includes those products or services that are reasonably interchangeable with, as well as identical to, defendant's product."). Plaintiff's definition not only fails to include any products which are reasonably interchangeable, it is untenable, it side-steps the need to find market power because it is restricting the market to the Defendants' product itself. Furthermore, there are no sufficient factual allegations in the Complaint that Uniface enjoys market power in their own product. *See Foundation for Interior Design Educ. Research and Savannah College of Art and Design*, 244 F.3d 521, 531 (6th Cir. 2001) (affirming district court's dismissal of Sherman Act claims where market definition was not supported by facts within the complaint).

Plaintiff's antitrust claims also fail to show a market-wide injury. While Plaintiff's argue that Defendants' license termination letter and previous threat of copyright lawsuit were "anticompetitive or exclusionary means," there are no specific facts alleged as to how such behavior impacted the market as a whole. In this regard, the case law is clear that merely alleging harm to an individual competitor is insufficient:

> A private antitrust plaintiff, in addition to having to show injury-in-fact and proximate cause, must allege, and eventually prove, 'antitrust injury.' " *Id*., at 909. "Antitrust injury" is (1) "injury of the

type the antitrust laws were intended to prevent" and (2) injury "that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "[T]he Sherman Act was intended to protect competition and the market as a whole, not individual competitors, the foundation of an antitrust claim is the alleged adverse effect on the market." *Care Heating & Cooling*, 427 F.3d at 1014 (citations omitted). Moreover, "[i]ndividual injury, without accompanying market-wide injury, does not fall within the protections of the Sherman Act. See *Dunn & Mavis*, 91 F.2d at 243-44 (holding that a complaint which fails to allege facts establishing that defendant's conduct had any significant anticompetitive effect on the market fails to state an antitrust claim)." Id.

*Eastman Outdoors Inc. v. Archery Trade Ass'n*, No. 05-74015, 2006 WL 1662641, at *12 (E.D. Mich. June 6, 2006). *See also Findling v. Realcomp II, Ltd.*, No. 17-cv-11255, 2018 WL 1425952, at *2 (E.D. Mich. March 22, 2018).

Again, Plaintiff has only alleged injuries flowing from the alleged breach of contract—injuries that are intrinsically specific to Plaintiff. There are no allegations regarding how the breach of contract would have an adverse effect on the market as a whole or how it caused any anti-competitive effects at all. In sum, Plaintiff's complaint states no facts constituting an injury to competition, but only states a possible breach of contract claim as it relates to ComSpec. *See Blount Financial Services, Inc. v. Walter E. Heller and Co.*, 819 F.2d 151, 152 (6th Cir. 1987). This is insufficient to withstand a motion to dismiss.

Accordingly, Plaintiff's antitrust claim is dismissed in its entirety.

c. **Violation of RICO**

14

Next, Defendants ask the Court to dismiss Plaintiff's RICO claim because the Complaint fails to allege a pattern of racketeering activity Plaintiff, however, alleges that the RICO claim is not based on a pattern of breaching contracts, but instead "Defendants' scheme to defraud Plaintiff AND other parties . . . to those contracts out of money." ECF No. 47, PageID.1577.

To properly state a RICO claim under 18 U.S.C. §1962(c), a plaintiff must allege four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). Additionally, when the predicate acts are based on fraud, Rule 9(b)'s heightened pleading requirements apply. *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 356, n. 4 (6th Cir. 2008). To satisfy the requirements under Rule 9(b), a party must "'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of [the other party]; and the injury resulting from the fraud.'" *Lee v. Sheet Metal Workers' Nat. Pension Fund*, 697 F. Supp. 2d 781, 788 (E.D. Mich. 2010) (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993)).

To demonstrate a pattern of racketeering activity, a plaintiff must demonstrate "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237–39 (1989). This requirement is

known as the "relationship plus continuity" test. *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 409 (6th Cir. 2012). To satisfy the "relationship" prong of the test, a plaintiff must demonstrate that "predicate acts have 'similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Id*. A plaintiff can satisfy the "continuity" prong by showing either a "close-ended" pattern (a series of related predicate acts extending over a substantial period of time) or an "open-ended" pattern (a set of predicate acts that poses a threat of continuing criminal conduct extending beyond the period in which the predicate acts were performed). *Id*. at 409-10.

Here, Plaintiff's Complaint falls short. First, there are insufficient allegations to demonstrate a continuous pattern of racketeering activity. As Plaintiff's own brief states: "The Complaint pleads multiple schemes of activity where the Defendants sought to collect unlawful debts from ComSpec on three different occasions, over a series of several months in 2019." ECF No. 47, PageID.1578. Attempts to collect debts on the same individual over a limited period of months do not provide sufficient predicate acts to establish a continuing pattern racketeering; such conduct presents no ongoing threat of "long-term criminal conduct." *See Grubbs*, 807 F.3d at 805; *H.J. In. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 242 (1989) ("Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this

16

requirement: Congress was concerned in RICO with long term *criminal* conduct.") (emphasis added).

Plaintiff's Complaint also fails to meet the relationship prong of the test. At best, the Complaint lists various years and references to other court cases where there was a dispute about royalty payments with Uniface and other companies. But, these incidents do not qualify as predicate acts; they do not have "similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Heinrich*, 668 F.3d at 409 Additionally, disputes over royalty payments—without more—can hardly be said to represent an enterprise or a pattern of illegal activity.

Finally, Plaintiff's Complaint fails to meet the heightened pleading requirements of Rule 9(b) for fraud claims. Most glaringly, Plaintiff fails to provide factual allegations which demonstrate the "time, place, and content of the allege misrepresentations on which [Plaintiff] relied." *Lee*, 697 F. Supp. 2d at 788. *See Heinrich v. Waiting Angels Adoption Servs.*, *Inc.*, 668 F.3d 393, 406 (6th Cir. 2012) (quoting *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir.1992) ("The courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity, unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading."). Plaintiff is required to

plead these facts as to *each* predicate act. But, when describing other allegedly fraudulent demands Defendant has made on other companies, Plaintiff only lists case numbers, broad timeframes, and conclusory statements as to the alleged scheme. *See* ECF No. 28, PageID.813 ("Within ten years of this suit, Uniface made, via wire, an inflated royalty demand on Cayenta for past royalties and threatened termination of the Uniface Application license.*"). See also Begala v. PNC Bank, Ohio, Nat. Ass'n*, 214 F.3d 776, 781–82 (6th Cir. 2000) ("[T]he complaint essentially lists a string of entities allegedly comprising the enterprise, and then lists a string of supposed racketeering activities in which the enterprise purportedly engages. Although the plaintiff may allege the separate elements of 'enterprise' and 'pattern of racketeering activity' through the same facts, the complaint must contain facts suggesting that the behavior of the listed entities is 'coordinated' in such a way that they function as a 'continuing unit[.]'") (internal citations omitted). Similarly, the allegation that Defendants conducted a "fraudulent internal investigation" and issued a "fraudulent royalty report" without more is purely conclusory. ECF No. 28, PageID.812. Together, the absence of factual allegations with regard to the predicate acts fail to satisfy the Rule 9(b) pleading standards.

In this case, because Plaintiff has fallen short of stating several of the required elements for a civil RICO claim, the RICO count fails to state a claim and must be dismissed.

### d.   Tortious Interference

Under Michigan law, "[t]he economic loss doctrine prohibits a plaintiff from bringing tort claims that are factually indistinguishable from breach of contract claims." *LinTech Glob., Inc. v. CAN Softtech, Inc.*, No. 2:19-CV-11600, 2020 WL 1861989, at *2 (E.D. Mich. Apr. 14, 2020) (referencing *Detroit Edison Co. v. NABCO, Inc.*, 35 F.3d 236, 240-41 (6th Cir. 1994). 'The doctrine draws a line between breach of contract claims arising from commercial transactions, where commercial and contract law protect the parties' economic expectations, and tort actions intended to remedy unanticipated injuries as a result of conduct that violates a separate legal duty apart from the contract." *Atlas Techs., LLC v. Levine*, 268 F. Supp. 3d 950, 963 (E.D. Mich. 2017) (referencing *Neibarger v. Universal Cooperatives, Inc.*, 439 Mich. 512, 521, 486 N.W.2d 612, 615 (1992)). This crucial distinction prevents contract law from being "drown[ed] in a sea of tort." *Huron Tool and Eng'g Co. v. Precision Consulting Serv., Inc.*, 532 N.W.2d 541, 546 (1995). However, because not all tort claims are barred by the existence of a contract, "Michigan courts must inquire whether the legal duty allegedly violated by a defendant 'arise[s] separately and distinctly from a defendant's contractual obligations.'" *DBI Invs., LLC v. Blavin*, 617 F. App'x 374, 381 (6th Cir. 2015) (quoting *Loweke v. Ann Arbor Ceiling & Partition Co., LLC*, 489 Mich. 157, 809 N.W.2d 553, 559 (2011)).

Defendants assert that both of Plaintiff's tortious interference claims should fail because in reality the allegations are all breaches of contract claims that are unable to support tort liability. ECF No. 44, PageID.1451. Plaintiff, however, alleges that the tortious interference claims are not barred by the economic loss doctrine because Defendants' "interference" with the two letters of intent to sell the business were separate from the breach of contract claims. ECF No. 47.

The record belies Plaintiff's argument. Plaintiff dedicates multiple paragraphs under the two counts for tortious interference explicitly discussing the provisions of the various contracts that Defendant allegedly breached and the subsequent impact on their attempted sales. For example, when explaining the tortious interference with business expectancy, Plaintiff states the following:

> They apparently failed to read their *own agreement*. Defendants should have known that inflating and then demanding a fraudulent royalty amount would have, and indeed has, interfered with ComSpec's business, including its ability to sell its business to any Buyer.

ECF No. 28, PageID.823 (emphasis added). Plaintiff's Amended Complaint goes on to state that "Potential Buyer B has confirmed the reason for not completing the transaction is *due to Uniface terminating the Agreement* and making the illegal $5.9M demand." ECF No. 28, PageID.826 (emphasis added). These statements illustrate how the tortious interference claims are not extraneous to the contract and that the true nature of this action is a breach of contract claim.

20

Accordingly, both of Plaintiff's tortious interference claims are dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Second Amended Complaint pursuant to Rule 12(b)(6) (ECF No. 44) is **GRANTED.** Plaintiff's claim against Uniface USA for breach of contract is **DISMISSED WITHOUT PREJUDICE.** Plaintiff's monopolization claim and RICO claim are also **DISMISSED WITHOUT PREJUDICE**. Additionally, Plaintiff's tortious interference with a business expectancy claim and tortious interference with contract claim are **DISMISSED WITH PREJUDICE**. Plaintiff's claim against Uniface B.V. for breach of contract remains to be litigated.

**SO ORDERED**.

Dated: September 14, 2021

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

21